## UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF PENNSYLVANIA

IN RE:                                    :        **Chapter 13**
                                          :
**SUSAN M. BOLTZ-RUBINSTEIN,**            :
                                          :        **Bky. No. 10-16541 ELF**
Debtor.                                   :
_____       :


                                          :
**SUSAN M. BOLTZ-RUBINSTEIN,**            :
                                          :
**Plaintiff,**                            :
                                          :
**v.**                                    :
                                          :
**BANK OF AMERICA,**                      :        **Adv. No. 16-0265**
                                          :
**Defendant.**                            :
_____       :


# M E M O R A N D U M

## I.  INTRODUCTION

Susan Boltz-Rubinstein ("the Debtor") filed this chapter 13 bankruptcy case on August 3, 2010.  She obtained confirmation of her chapter 13 plan and then performed her obligations under her confirmed chapter 13 plan. She also received a discharge.

The Debtor commenced this adversary proceeding in 2016..  She seeks damages pursuant to 11 U.S.C. §362(k) for an asserted willful violation of the automatic stay that occurred in 2016, after she completed her plan, but before the entry of her discharge.  She alleges that Defendant Bank of America ("BOA") violated the stay when it attempted to collect a pre-petition debt by sending notices in furtherance of the applicable state law procedural requirements for foreclosure against her residential real property.

BOA asserts there was no stay violation because it was acting as servicer for the actual

-1-

holder of the mortgage, National Residential Assets Corporation ("NRAC"), which obtained relief from the automatic stay before BOA sent the notices to the Debtor.  BOA points to a 2005 servicing agreement between its predecessor, BAC Home Loans Servicing, LP ("BAC") and Bank of New York Mellon ("BNYM"), the parent company of NRAC as proof of that agency relationship..

The Debtor counters that, notwithstanding the existence of a servicing agreement between BNYM (NRAC's parent) and BAC (BOA's predecessor), BOA lacked authority to act on NRAC's behalf and therefore is liable for its collection efforts in violation of the automatic stay.

BOA filed a motion for summary judgment on April 27, 2018 ("the Motion").

For the reasons discussed below, I conclude that a material issue of fact remains whether there was an agency relationship between BOA and NRAC when BOA sent the notices to the Debtor in 2016.  Therefore, I will deny the Motion.


## II.  PROCEDURAL AND FACTUAL HISTORY

### A.  Procedural History

Much of the history of this adversary proceeding was stated in the court's opinion published on September 18, 2017, which granted in part and denied in part the Defendants' motions to dismiss this adversary proceeding (and related adversary proceeding, Adv. No. 16-362). See In re Boltz-Rubinstein, 574 B.R. 542 (Bankr. E.D. Pa. 2017) (the "Prior Opinion"). Only a portion of that history will be repeated here.

The Debtor initiated this adversary proceeding against BOA on August 17, 2016. She filed an Amended Complaint on August 29, 2016. In the Order accompanying the Prior Opinion,

I dismissed three (3) of the four (4) counts of the Amended Complaint; only Count IV, stating a cause of action for violation of the automatic stay, survived. The Defendant answered the Amended Complaint on October 10, 2017.

Following multiple, extended  discovery disputes, involving motions to compel discovery and for protective orders, the Defendant filed the Motion on April 27, 2018. The Debtor responded on June 3, 2018.  BOA filed a reply on June 4, 2018 ("the Reply"), which BOA answered on June 11, 2018.  The Debtor filed a sur-reply on June 18, 2018 ("the Sur-Reply").  With leave of the court, the Debtor  filed a second reply to the Motion on June 28, 2018.

Further, in partial response to the Motion, the Debtor filed two (2) Motions to Strike Affidavits filed by the Defendant (Doc. #'s 109, 110).  The Motions to Strike sought to exclude the affidavits of Heather D. Nolan and Leticia Pasillas.  By Orders dated June 4, 2018, I denied both Motions to Strike without prejudice and provided that the requests that the affidavits be disregarded would be considered as part of the Debtor's response to the Motion.  (Doc. #'s 111, 112).[1]

### B. Undisputed Facts

### 1. the servicing agreement

On November 15, 2005, the Debtor borrowed $593,334.00 from BOA.  The loan was secured by a mortgage on her primary residence located at 3444 Wiltshire Rd. in Furlong,

---

[1]      Thus, the Plaintiff's pleadings now amount to an objection to consideration of the submissions pursuant to F.R.C.P. 56(c)(4) ("An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated.").

As will be seen below, in some respects I have accepted the content of the affidavits; in other respects, I have not.

Pennsylvania ("the Property").  On December 10, 2010, the Mortgage was assigned from BOA to

NRAC.[2]

On November 1, 2005, prior to the issuance of the Debtor's mortgage, BAC and BNYM[3]

entered into a "Flow Mortgage Loan Sale and Servicing Agreement" (the "Servicing

Agreement").[4] (Affid. of Leticia Pasillas ("Pasillas Affid."), Ex. C) (Doc. # 98).   Pursuant to the

---

[2]        The summary judgment record includes the written mortgage assignment between BOA and NRAC.  The Debtor does not dispute the authenticity of the mortgage assignment, but questions its legal validity and effect.  (See Amended Complaint ¶ 3; Reply to Motion at 2).  However, the Debtor offers no evidence to support her contention that the assignment is not valid.

The Debtor also argues, generally, that because BOA denies or ignores the fact that her loan was securitized, all of the documents it offers as evidence are not trustworthy and therefore, NRAC is not the holder of the loan. (E.g., Reply to Motion at 5; Sur-Reply at 10). The Plaintiff also provides no evidence in support of this contention. See n.4, infra. I give no credence to the Debtor's constant suggestion that I should discredit virtually every piece of evidence presented by BOA.

[3]        The party to this document is the Bank of New York, not BNYM. Bank of New York later changed its name to Bank of New York Mellon. (See Servicing Amendment, Affid. of Leticia Pasillas, Ex. E) (Doc. # 98).

[4]        The Debtor appears to object to consideration of the content of the Servicing Agreement. (See Plaintiff's Counter Statement of Facts at 5-9) (Doc. 113-1).  However, the Debtor does not question the authenticity of the document, but in a lengthy, rambling, largely incomprehensible objection, appears to be most concerned that "[t]he servicing agreement indicates a lack of trustworthiness" – whatever that means.  Id. at 2.

I am satisfied that I may consider the Servicing Agreement for the purpose for which BOA has offered it: as the memorialization of the terms of a contract between BAC and BNYM.  The Debtor has not offered sufficient counter-evidence or opposing facts as to why this document should not be considered.  See Matsushita Elec. Indus. v. Zenith Radio Corp., 475 U.S. 574, 586-7 (1986) ("the issue of fact must be 'genuine'. . . When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts . . . the nonmoving party must come forward with 'specific facts showing that there is a genuine issue for trial.") (citing Fed. Rules Civ. Proc. 56(c), (e)) (emphasis in original); Lindsey v. St. Mary Medical Center, 2016 WL 878307, at *4 (E.D. Pa. Mar. 7, 2016) ("the non-moving party may not merely deny the allegations in the moving party's pleadings; instead he must show where in the record there exists a genuine dispute over a material fact.") (citing Doe v. Abington Friends School, 480 F.3d 252, 256 (3d Cir. 2007) (internal quotations and further citations omitted)).

terms of the Servicing Agreement, BOA was to continue servicing various loans that BOA

transferred to BNYM.[5]

More pertinent to the current dispute, the Servicing Agreement permits BOA to "effectuate

foreclosure or other conversion of the ownership of the Mortgaged Property securing any Mortgage

Loan it services." (Pasillas Affid., Ex. C §10.01, at 37).[6]

On February 8, 2010, the Servicing Agreement was amended by letter ("the Servicing

Amendment") (Id., Ex. H). The Servicing Amendment provides, in pertinent part:

if title to any Mortgaged Property is acquired in foreclosure or by deed in lieu of

---

[5]    The Servicing Agreement provides

> WHEREAS, the Seller [BOA] has agreed to sell from time to time to the
> Purchaser [BNYM], and the Purchaser . . . has agreed to purchase from time to
> time from the Seller, certain residential, first-lien Mortgage Loans . . . as
> described herein on a servicing-retained basis, and which shall be delivered as
> whole loans as provided herein. . . .

(Pasillas Affid., Ex. C., at 1).

> By a Term Sheet with a closing date of January 27, 2006, BOA sold BNYM certain loans
listed on a "Schedule I" pursuant to the terms of the Servicing Agreement. (Pasillas Affid., Ex. D).
However, "Schedule I" is not attached to the Term Sheet submitted in support of the Motion.

[6]    The Servicing Agreement also states that BAC

> in its own name . . . is hereby authorized and empowered by [BNYM] . . . to
> execute and deliver, on behalf of itself or the Purchaser, all instruments of
> satisfaction or cancellation, or of partial or full release, discharge and all other
> comparable instruments, with respect to the Mortgage Loans and the Mortgaged
> Properties **and to institute foreclosure proceedings or obtain a deed-in-lieu of
> foreclosure so as to convert the ownership of such properties**, and to hold or
> cause to be held title to such properties, on behalf of the Purchaser pursuant to
> the provisions of Subsection 10.13.

(Pasillas Affid., Ex. C, §10.01, at 38-39) (emphasis added).

foreclosure, the deed or certificate of sale shall be taken in the name of 'National Residential Assets Corp.' unless [BOA] is directed otherwise by [BNYM].

## 2.    the events during the bankruptcy case

The Debtor commenced her chapter 13 case on August 10, 2010.

On March 21, 2011, BAC, purportedly as servicer for NRAC, filed a proof of claim in the amount of $587,118.56 (Claim No. 17-1) ("the Claim").  The Claim states that the debt is secured by the Property.

The Debtor's chapter 13 plan was confirmed on January 10, 2012.  The plan does not provide for a cure of the delinquent mortgage on the Property.  Rather, the plan states:

> The pre-petition mortgage arrears owed to Bank of America Home Loans Servicing, LP, and the pre-petition real estate tax arrears owed to Bucks County Tax Claims Bureau will not be paid through the plan. .   .   .   The aforesaid arrears . . . will be cured through the mortgage loan modification.

(Third Amended Plan §7(f) and (g)) (Bky. No. 10-16541, Doc. # 167).

On May 4, 2016, NRAC filed a motion for relief from the automatic stay in order to prosecute a foreclosure proceeding against the Property, asserting that the Debtor had no equity in the Property and that NRAC was not adequately protected ("the Motion for Relief") (Doc. # 283).  Following a hearing on June 23, 2016, the Motion for Relief was granted. (Bky. No. 10-16541, Doc. # 293) (the "Stay Relief Order").  The Stay Relief Order granted NRAC relief but noted that "[n]othing in this Order constitutes a determination that [NRAC] is the holder of the Note or Mortgage referenced in the Motion and all such issues may be determined by another court of competent jurisdiction."[7]

---

[7]      The Debtor disputed the validity of the assignment of the mortgage to NRAC in her

(continued...)

Shortly following the issuance of the Stay Relief Order, BOA sent the Debtor the following

four (4) communications relating to her mortgage on the Property:

- an Act 91 notice, dated July 18, 2016, informing the Debtor of a default on her mortgage and stating that the Debtor must either cure the default or risk foreclosure;[8] and

- three (3) loan assistance offer letters, dated July 19, 2016, July 20, 2016, and August 5, 2016, that referenced the possibility of loan modification, refinancing, forbearance, delinquency repayment plan, short sale and deed-in-lieu of foreclosure.

(See Amended Complaint, Exhibits B, C, D, F) (collectively, the "Notices").

The Debtor contends that BOA violated the automatic stay by sending the Notices.

## III.  SUMMARY JUDGMENT STANDARD

Pursuant to Fed. R. Civ. P. 56(a), applicable in this adversary proceeding through Fed. R.

Bankr. P. 7056, summary judgment must be granted to a moving party when, drawing all reasonable

inferences in favor of the nonmoving party, there is no genuine issue as to any material fact and the

moving party is entitled to judgment as a matter of law.  E.g., Steele v. Cicchi, 855 F.3d 494, 500

---

[7](...continued)
response to the Motion for Relief.  When I entered the Stay Relief Order, however, I concluded that NRAC made a sufficient showing regarding its interest in the mortgage on the Property to establish its standing, see In re Alcide, 450 B.R. 526, 536 (Bankr. E.D. Pa. 2011), and that further determinations regarding the validity of the mortgage assignment and NRAC's asserted right to foreclose should be determined by the state court, applying applicable nonbankruptcy law.  In deferring to the state court, I was influenced by the fact that the Debtor's confirmed chapter 13 plan provided neither for a cure nor a payoff of the subject mortgage, see 11 U.S.C. §§1322(b)(5), 1325(a)(5); see generally In re Thorpe, 2019 WL 262197 (Bankr. E.D. Pa. Jan. 17, 2019) (court declines to resolve post-petition payment dispute between debtor and mortgagee whose claim was not provided for in the debtor's plan).

[8]      An Act 91 notice is a pre-foreclosure notice required by statute to be sent to certain residential homeowners prior to the initiation of mortgage foreclosure proceedings. See 35 P.S. §§ 1680.402c(a), 1680.403c(a).

(3d Cir. 2017); In re Bath, 442 B.R. 377, 387 (Bankr. E.D. Pa. 2010); see also In re Asbestos Prods.

Liab. Litig. (No. VI), 2016 WL 4750507, at *3 (3d Cir. Sept. 13, 2016).

On a motion for summary judgment, the court's role is not to weigh the evidence, but to

determine whether there is a disputed, material fact for resolution at trial.  Anderson v. Liberty

Lobby, Inc., 477 U.S. 242, 249 (1986).  A genuine issue of material fact is one in which sufficient

evidence exists that would permit a reasonable fact finder to return a verdict for the non-moving

party.  Id. at 248. A fact is material "if its existence or nonexistence might impact the outcome of

the suit . . .  A dispute over a material fact is 'genuine' if nonexistence might impact the outcome

of the suit . . . ." Betz v. Satteson, 715 Fed. Appx. 213, 215 (Nov. 16, 2017) (non precedential)

(quoting Weist v. Tyco Elecs. Corp., 812 F.3d 319, 328 (3d Cir. 2016)) (additional citation omitted).

The parties' respective burdens of proof also play a role in determining the merits of a

summary judgment motion. See In re Polichuk, 506 B.R. 405, 421 (Bankr. E.D. Pa. 2014).

If the movant is the defendant or the party without the burden of proof, the movant must

demonstrate the absence of a genuine issue of material fact, but the movant is not required to support

the motion with affidavits or other materials that negate the opponent's claim.  Rather, the movant

may assert that the party with the burden of proof has not come forward with evidence to support one

or more elements of its claim.  See Celotex Corp. v. Catrett, 477 U.S. 317, 323-34 (1986).

On the other hand, if the movant is the party with the burden of proof at trial, the standard

is more stringent.  The movant "must produce enough evidence to justify a directed verdict in its

favor in order to meet its initial burden." Nat'l State Bank v. Fed. Reserve Bank of New York, 979

F.2d 1579, 1582 n.2 (3d Cir. 1992); see also In re Newman, 304 B.R. 188, 193 (Bankr. E.D. Pa.

2002).

## IV.  THE PARTIES' ARGUMENTS

The Defendant argues that it did not violate the automatic stay because it was acting as an agent of NRAC when it sent the Notices to the Debtor.

The logic goes like this:

- NRAC, which received relief from the automatic stay, is the assignee and owner of the Debtor's mortgage.

- BOA was servicing NRAC's loan and acting as NRAC's agent when it sent the notices to the Debtor in 2016.

- The agency relationship was established by the Servicing Agreement between BNYM and BAC and the Servicing Amendment thereto.

- A separate agreement between NRAC and BOA was not needed to make the Servicing Agreement effective as between BOA and NRAC because NRAC is BNYM's wholly-owned subsidiary.

In sum, BOA argues that "[b]ecause BNYM and NRAC are functionally one entity with respect to the foreclosure of properties covered by the Servicing Agreement, then, *a fortiori*, [BOA] is agent of both entities." (Reply at 4).

BOA further asserts both that the Debtor has failed to produce either any evidence of actual damages or any documents to substantiate alleged monetary loss.  Attorney's fees, according to BOA, are not actual damages for purposes of a stay violation.

The Debtor attacks BOA's logic in two (2) ways.  First, the Debtor claims that there is insufficient evidence that NRAC is a wholly owned subsidiary of BNYM.  Second, and relatedly, she asserts the there is a lack of evidence that an agency relationship exists between BOA and NRAC. Therefore, the Plaintiff concludes that the record fails to show any agency relationship between BOA and NRAC and without such a relationship, BOA is not insulated from liability by the order granting NRAC relief from the automatic stay.

The Plaintiff further asserts, contrary to the BOA's contention, that she has actual damages caused by the violation of the automatic stay. The Debtor submitted an affidavit that describes the emotional distress she claims to have suffered as a result of the Notices. The Debtor also contends that she is entitled to attorney's fees.

## V. LEGAL STANDARDS

### A. The Automatic Stay

#### 1. general principles

It is well established that the automatic stay is designed to stop pending debt collection activity and litigation and is considered one of the fundamental protections afforded by the Bankruptcy Code. E.g., H & H Beverage Distributors v. Dep't of Revenue of Com. of Pa., 850 F.2d 165, 166 (3d Cir. 1988);  In re Billings, 544 B.R. 529, 533 (Bankr. E.D. Pa. 2016), aff'd, 687 F. App'x 163 (3d Cir. 2017) (nonprecedential).

The purpose and effect of the stay is to: (1) stop all creditor collection efforts; (2) stop all harassment of a debtor seeking relief; and (3) maintain the status quo between the debtor and creditors. Billings, 544 B.R. at 534; accord The Connelly Firm, P.C. v. U.S. Dep't of the Treasury, 2016 WL 1559299, at *4 (D.N.J. Apr. 18, 2016); In re Mu'min, 374 B.R. 149, 154 (Bankr. E.D. Pa. 2007).

#### 2. 11 U.S.C. §362(k)

11 U.S.C. §362(k) provides a remedy for a violation of the automatic stay.

To hold a creditor accountable for injuries caused by a violation of the automatic stay,

§362(k)(1), the debtor must establish three (3) elements:

> (1) the offending party must have violated the stay;
>
> (2) the violation must have been willful; and
>
> (3) the willful violation must have caused the debtor some injury.

In re Miller, 447 B.R. 425, 433  (Bankr. E.D. Pa. 2011); accord In re Wingard, 382 B.R. 892, 900

(Bankr. W.D. Pa. 2008).

The Third Circuit recently summarized the standard for the concept of a "willful" violation

of the automatic stay:

> It is a willful violation of the automatic stay when a creditor violates the stay with
> the **knowledge that the bankruptcy petition has been filed. Willfulness does
> not require that the creditor intend to violate the automatic stay provision,
> rather it requires that the acts which violate the stay be intentional** . . . . [A]
> creditor's 'good faith' belief that he is not violating the automatic stay provision
> is not determinative of willfulness. . . .

In re Lansaw , 853 F.3d 657, 664 n.4 (3d Cir. 2017) (emphasis added) (quoting In re Landsdale

Family Rests., Inc, 977 F.2d 826, 829 (3d Cir. 1992)); see also In re Atlantic Business & Community

Corp., 901 F.2d 325, 329 (3d Cir. 1990) ("the statute provides for damages upon a finding that the

defendant knew of the automatic stay and that the defendant's actions which violated the stay were

intentional") (citations omitted).

Knowledge of the existence of the bankruptcy case is "treated as knowledge of the automatic

stay." E.g., In re Theokary, 444 B.R. 306, 322 (Bankr. E.D. Pa. 2011) (collecting cases).

The statute "explicitly requires that a debtor 'must have been injured by the stay violation'

and 'that the creditors' actions caused the debtor to suffer damages which are 'actual,' that is

damages that the debtor in fact incurred." In re Sciortino, 561 B.R. 569, 579 (Bankr. N.D. Ga. 2016)

(citation omitted); accord In re Traversa, 585 B.R. 215, 221 (Bankr. E.D. Pa. 2018) (stating that an

injury is an essential element of a stay violation claim and citing cases); In re Miller, 447 B.R. at 427 and 434.

Further, a debtor may recover "actual damages, including costs and attorneys' fees" for a willful violation of the stay.[9] 11 U.S.C. §362(k)(1).

The Third Circuit has determined that "actual damages" may include recovery for emotional distress in appropriate cases. Lansaw, 853 F.3d at 664.[10]  In order to recover damages for emotional distress, a debtor must demonstrate that he or she "suffered 'actual' emotional harm caused by the willful stay violation." Id. at 670 (noting that the necessary evidence will "vary from case to case").

Not every willful violation of the stay warrants compensation for emotional distress. Lodge v. Kondaur Capital Corp., 750 F.3d 1263, 1271 (11th Cir. 2014). In order to recover damages following a willful stay violation, a plaintiff must:

> (1) have suffered significant emotional distress;
>
> (2) clearly establish the significant emotional distress; and
>
> (3) demonstrate a causal connection between that significant emotional distress and the stay violation.

---

[9]     Debtors may also recover punitive damages "in appropriate circumstances." 11 U.S.C. §362(k)(1).  Punitive damages are available in egregious cases and upon the consideration of the following three guideposts: 1) the degree of reprehensibility of the defendant's misconduct; 2) the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award; and 3) the difference between the punitive damages awarded . . . and the civil penalties authorized or imposed in comparable cases." Lansaw, 853 F.3d at 671 (quoting CGB Occupational Therapy Inc. v. RHA Health Servs. Inc., 499 F.3d 184, 189 (3d Cir. 2007)) (additional citation omitted). In Lansaw, the Third Circuit upheld an award of punitive damages and noted that the stay violations were "reprehensible" and "egregious."  Lansaw, 853 F.3d at 671. See also In re Vu, 591 B.R. 596, 607 (Bankr. E.D. Pa. 2018) ("Punitive damages are a response to particularly egregious conduct . . . .").

[10]     The court did not decide whether financial injury is a "necessary predicate" to recovery for emotional distress. Lansaw, 853 F.3d at 668.

Id. (finding that the debtors failed to show either that they suffered significant distress or a causal connection between any stress and the stay violation) (citing In re Dawson, 390 F.3d 1139, 1149 (9th Cir. 2004)); accord In re Durham, 2016 WL 827255 (Bankr. S.D. Fla. February 11, 2016); In re Dean, 490 B.R. 662, 669 (Bankr. M.D. Pa 2013).

### 3. the automatic stay and agency relationships

It is well settled, in addition to being settled in this very proceeding, "that an entity that obtains stay relief can delegate that relief to an agent, which can properly take action without violating the stay."  Boltz-Rubinstein, 574 B.R. at 555 n.14; accord Black v. HSBC Bank, USA, N.A., 514 B.R. 605, 615 (Bankr. E.D. Cal. 2014) (same).

### B. Relationship of Parent and Subsidiary Corporations - Generally

In corporate law, the legal relationship between a parent and subsidiary corporation[11] is well established.  A fundamental tenet is that a parent company is a distinct legal entity from its subsidiaries.  E.g., American Bell Inc. v. Federation of Tel. Workers of Pa., 736 F.2d 879, 886 (3d Cir. 1984) ("A court may not disregard at will the formal differences between affiliated corporations").  A corollary principle that follows from the separate status of parent and subsidiary corporations is that the action of a parent or subsidiary does not bind the other entity.

---

[11]     A subsidiary is"[a]ny corporation as to which any other corporation is the beneficial owner, directly or indirectly, of shares of the first corporation that would entitle the other corporation to cast in excess of 50% of the votes that all shareholders would be entitled to cast in the election of directors of the first corporation." 15 Pa.C.S.A. §2552. See also Symons Int'l Group, Inc. v. Continental Casualty Co., 2017 WL 4269880, at *4 (S.D. In. Sept. 26, 2018) (citing THE LAW DICTIONARY, http://thelawdictionary.org/subsidiary) (subsidiary is defined as an "enterprise that is controlled by another by owning more than 50% of the voting stock.").

These principles have been stated in numerous reported decisions, perhaps most concisely

by Judge Becker in Pearson v. Component Tech. Corp., 247 F.3d 471, 484 (3d Cir. 2001) (citation

omitted):

> The corporate form was created to allow shareholders to invest without incurring
> personal liability for the acts of the corporation. These principles are equally applicable
> when the shareholder is, in fact, another corporation, and hence, mere ownership of a
> subsidiary does not justify the imposition of liability on the parent.

A "general principle of corporate law deeply ingrained in our economic and legal systems

[is that] a parent corporation . . . is not liable for the acts of its subsidiaries." In re Pennsylvania

Title Ins. Antitrust Litig., 648 F. Supp. 2d 663, 687 (E.D. Pa. 2009) (quotation marks omitted)

(quoting United States v. Bestfoods, 524 U.S. 51, 61 (1998)); accord Dayhoff Inc. v. H.J. Heinz Co.,

86 F.3d 1287, 1297 (3d Cir. 1996) (holding that an arbitration agreement is a contract enforceable

only by the parties to it and not by a parent company and further stating that "there is no more reason

to disregard the corporate structure with respect to such claims as there would be to disregard it with

respect to other legal matters."); Northbound Group, Inc. v. Norvax, Inc., 795 F.3d 647 (7th Cir.

2015) (affirming summary judgment for defendant on breach of contract cause of action because the

parent company was not a party to the contract of its subsidiary).[12]

---

[12]    See also Dole Food Co. v. Patrickson, 538 U.S. 468, 475 (2003) ("A corporate parent
which owns the shares of a subsidiary does not, for that reason alone, own or have legal title to the assets
of the subsidiary. . . .") (citing 1 W. Fletcher, Cyclopedia of the Law of Private Corporations §31 (rev.
ed. 1999)); Mellon Bank, N.A. v. Metro Communications, Inc., 945 F.2d 635, 643 (3d Cir. 1991) ("there
is a presumption that a corporation, even when it is a wholly owned subsidiary of another, is a separate
entity. The law recognizes the legal distinction of affiliated corporations as do business people."); Grice
v. CVR Energy, Inc. 2017 WL 3032221, at *2 (N.D. OK. July 17, 2017) ("case law precludes an
inference of control by a parent company where it operated merely in an 'advisory' role.") (citation
omitted); In re Regency Holdings (Cayman), Inc., 216 B.R. 371, 375 (Bankr. S.D.N.Y. 1998) (holding
that parent company had no right to recover preferential or fraudulent transfers of its subsidiaries and
noting that "[a]s a rule, parent and subsidiary corporations are separate entities, having separate assets
and liabilities") (citing Mellon Bank and 1 Charles R.P. Keating, et al., Fletcher Cyclopedia of the Law
of Private Corporations, §25, at 30 (1997 Supp.)); In re FBI Wind Down, Inc., 581 B.R. 116, 131 (Bankr.
(continued...)

# VI.  DISCUSSION

## A. BOA Is Not Entitled to Summary Judgment

### 1.  overview

BOA's primary defense is that it was acting as an agent of NRAC when it sent the Notices in compliance with the Servicing Agreement and Amendment.  According to BOA, this agency relationship means that it is entitled to take advantage of the Stay Relief Order, which was entered in the name of NRAC.  I conclude, however, that the evidentiary record at summary judgment fails to support BOA's factual contention regarding the existence of the asserted BOA-NRAC agency relationship.

As discussed below, BOA has not offered any evidence of a direct contractual arrangement between NRAC and BAC (BOA's predecessor) in which NRAC authorized BAC (later BOA) to act as NRAC's agent in connection with the Notices it sent to the Debtor.  Further, notwithstanding BOA's argument to the contrary, nothing in the Servicing Agreement (between BAC and BNYM) creates contractual privity between BOA and BNYM's subsidiary, NRAC.  NRAC is not a party to the Servicing Agreement.  Nor is there any language in the Servicing Agreement t establishing an agency relationship between BAC and NRAC.  While the Servicing Agreement specifically permits BOA to foreclose on relevant mortgage loans,[13] on the face of the document, those rights flow from BNYM to BAC, not NRAC to BAC.

---

[12](...continued)
D. Del. 2018) (citing Regency Holdings).

[13]        The Servicing Amendment does require BOA to title property in the name of NRAC.
(Pasillas Affid., Ex. H). However, this provision - which amounts to a party placing property in the hands of its subsidiary - does not, by itself, signify an agreement or create a contract between BOA and NRAC.

In the absence of any contract between NRAC and BAC, BOA's argument for agency

rests on the legal theory that a subsidiary (NRAC) is bound by the contract of its parent (BNYM).

As explained below, case law is to the contrary generally, see Part V.B., supra, and BOA has not

put forth sufficient evidence to establish the elements of any exception to this general rule.

Accordingly, BOA has not met its burden.  The BNYM-BOA relationship does not create an

agency relationship between NRAC and BOA.

## 2.   the limited scope of Copperweld

The principle of "separateness" between a parent and subsidiary means the entities enjoy

separate legal status and that a subsidiary (here, NRAC) is not a party to a contract between the

parent (here, BNYM) and a third party (here, BAC/BOA).

To defeat this general principle, BOA argues there is a "unity of interest" between BNYM

and NRAC, relying on oft-cited Supreme Court case, Copperweld Corp. v. Independence Tube

Corp., 467 U.S. 752, 771-2 (1984).

In Copperweld, the Supreme Court stated:

> A parent and its wholly owned subsidiary have a complete unity of interest. Their
> objectives are common, not disparate; their general corporate actions are guided or
> determined not by two separate corporate consciousness, but one. . . . They share a
> common purpose whether or not the parent keeps a tight rein over the subsidiary; the
> parent may assert full control at any moment if the subsidiary fails to act in the parent's
> best interests.

BOA argues that BNYM and NRAC have a "unity of interest" with respect to the Property

(because NRAC holds the mortgage and BNYM owns NRAC) and that "[t]here need not be any

separate agreement between BNYM and NRAC because BNYM will effectively own anything

NRAC may acquire."  (BOA Reply Memorandum at 3) (Doc. # 116).

I respectfully disagree.

Copperweld was an antitrust case in which the Court held that a parent corporation and its wholly owned subsidiary were not legally capable of conspiring with each other under section 1 of the Sherman Act, 15 U.S.C. §1 et. seq.  At its core, Copperweld was a case construing the Sherman Act. BOA reads far too much into Copperweld if it suggests that a Supreme Court decision interpreting the Sherman Act was intended to nullify long-held, cardinal state law principles regarding the separate corporate existence of parent and subsidiary corporations.

Courts have considered the passage in Copperweld quoted above, the "unity of interest" concept, and the potential for blurring the distinction between a parent and subsidiary corporation in other legal contexts, such as:

- under the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§1961 et. seq.;[14]

- under the National Labor Relations Act, 29 U.S.C.§§ 151 et. seq.;[15]

- in the application of claim or issue preclusion;[16]

- in determining the reach of "long-arm" jurisdiction;[17] and

- in determining the reach of "related to" jurisdiction in bankruptcy cases under

---

[14]    E.g., Philadelphia TMC, Inc. v. AT & T Info. Sys., Inc., 651 F. Supp. 169, 172 (E.D. Pa. 1986).

[15]    E.g., Nesbit v. Gears Unlimited, Inc., 347 F.3d 72, 85 (3d Cir. 2003).

[16]    E.g., Am. Home Assurance Co. v. Church of Bible Understanding, 2004 WL 1964906, at *3 (E.D. Pa. Aug. 16, 2004).

[17]    E.g., Botwinick v. Credit Exch., Inc., 213 A.2d 349, 353-54 (Pa. 1965).

28 U.S.C. §1334.[18]

The concept of "unity of interest" arises perhaps most frequently in the traditional context of plaintiffs attempting to pierce the corporate veil of a defendant. In that context, the plaintiff typically contends that a parent and subsidiary corporation are alter egos, so that the plaintiff may hold one entity liable for the torts or contract breaches of the other.[19]

Under Pennsylvania law, however, there is a strong presumption against piercing the separate corporate existence of a corporation and its owner. See, e.g., Lumax Indus. Inc. v. Aultman, 669 A.2d 893 (Pa. 1995); Price v. Foremost Indus., Inc., 2017 WL 6596726, at *7 (E.D. Pa. Dec. 22, 2017); see also Trinity Indus., Inc. v. Greenlease Holding Co., 903 F.3d 333, 368 (3d Cir. 2018). To obliterate the separate corporate status in the parent/subsidiary context, a plaintiff must prove that: (1) the parent exercised sufficient domination and control over the subsidiary corporation such that the subsidiary was a mere alter ego of the parent, with no separate existence; and (2) injustice will result if the corporate fiction is maintained. E.g., Allegheny Energy Supply Co., LLC v. Wolf Run Min. Co., 53 A.3d 53, 58 (Pa. Super. Ct. 2012). In evaluating the issue, courts consider whether the subsidiary was undercapitalized, any failure to adhere to corporate formalities, whether there was a substantial intermingling of affairs, and whether the corporate form was used to perpetuate a fraud. E.g, Advanced Tel. Sys., Inc. v. Com-Net Prof'l Mobile Radio, LLC, 846 A.2d 1264, 1278 (Pa. Super. Ct. 2004).

---

[18] In re Combustion Eng'g, Inc., 391 F.3d 190, 230–31 (3d Cir. 2004), (as amended (Feb. 23, 2005)).

[19] E.g., Pearson v. Component Tech. Corp., 247 F.3d 471, 484 (3d Cir. 2001); Prochazka ex rel. Spencer v. Sunrise Senior Living, Inc., 2013 WL 1285271, at *2 (D.N.J. Mar. 26, 2013) (applying New Jersey law) (citing Mall at IV Grp. Props., L.L.C. v. Roberts,, 2005 WL 3338369 (D.N.J. Dec. 8, 2005).

### 3.  other potential legal theories

Though Copperweld does not provide adequate support for BOA's position, other authority within the context of arbitration agreements suggests that there are situations in which a non-signatory to a written contract may be treated as a party to the contract.

Courts have held that a non-signatory to an agreement containing an arbitration clause can be bound to the agreement under these theories: (1) incorporation by reference; (2) assumption; (3) agency; (4) veil-piercing/alter ego; and (5) estoppel.  E.g., Just B Method, LLC v. BSCPR, LP, 2014 WL 5285634, at *7 (E.D. Pa. Oct. 14, 2014); see also E.I. DuPont de Nemours & Co. v. Rhone Poulenc Fiber & Resin Intermediates, S.A.S., 269 F.3d 187, 194 (3d Cir.2001); Fencourt Reinsurance Co. v. ITT Indus., Inc.,  2008 WL 2502139, at *9 (E.D. Pa. June 20, 2008).

Assuming, arguendo, that the principles extending the duty to arbitrate to a non-signatory to an arbitration agreement are applicable here, I would need to evaluate whether the summary judgment record supports a finding that, based on undisputed facts, the conduct of BOA, BNYM and NRAC falls within one (1) of the five (5) theories for binding a non-signatory to a contract, described in the paragraph above.

In support of the Motion, BOA submitted  the affidavits of Heather Nolan, Leticia Pasillas, Ann Golio, and the Secretary's Certificate[20]  (collectively, "the Affidavits").  (See Plaintiff's Motion to Strike Affidavit of Heather D. Nolan at 6) (Doc. # 109); (see generally Plaintiff's Sur-Reply; Doc. # 117).  The Debtor requests that I disregard them because they do not provide competent, admissible evidence.  See Fed. R. Civ. P. 56(c)(2).

---

[20]      The "Secretary's Certificate" is an affidavit submitted in support of the Defendant's Motion by the Secretary of BNYM. Nolan Affid., Ex. B (Doc. # 98-2).

I agree with the Debtor.  All four affidavits fail to provide any competent evidence; particularly on the requisite agency relationship between NRAC and BAC/BOA.[21]

For example, the Pasillas Affidavit states that "BOA was acting as NRAC's agent when it sent the Act 91 Notices to Debtor which form the basis of Debtor's Complaint." (Pasillas Affid. at 4).    Similarly, the Golio Affidavit that NRAC authorized BOA to act "on its behalf and subject to NRAC's control...with respect to certain foreclosure related activity."  (Golio Affid. ¶ 4).   These material factual averments in each affidavit are no more than conclusory statements, lacking a proper foundation.  BOA cannot simply offer such pre-packaged legal conclusions.[22]

None the Affidavits offer competent evidence sufficient to warrant a disregard of the corporate distinction between the entities under any legal theory.

### 4. summary

In sum, BOA's evidence does not allow me to conclude that BOA acted as NRAC's agent when it sent the Notices under any legal theory. Neither the Servicing Agreement nor the Affidavits and Amendment establish this as an undisputed fact. Consequently, BOA has not met its summary judgment burden on this issue.

---

[21]        I denied the Plaintiff's Motion to Strike but stated that I would consider the arguments therein as part of the Debtor's Response.

[22]        The Golio Affidavit purports to provide a foundation by stating that Ms. Golio has access to NRAC business records and knowledge of relevant information about the dealings between NRAC, BOA and BNYM.  The glaring flaw in this Affidavit, however, as the Debtor points out, is that Ms. Golio does not explain her position in any of these organizations, or how she might have access to these documents and information.  She also states that NRAC authorized Ann Golio "to execute this affidavit" on its behalf, but does not explain why or how this authorization was made known to Ann Golio.  (Golio Affid. ¶ 1).  As presented, the Golio Affidavit is simply an individual named Ann Golio swearing that certain things are true.

## B. There is a Material Factual Dispute over Damages

In order to recover damages under §362(k)(1), a debtor must establish that a stay violation occurred which was willful **and that the willful violation caused injury to the debtor**. 11 U.S.C. § 362(k)(1).  BOA contends that this essential element is lacking from the Debtor's case.

The Debtor has submitted an affidavit alleging a host of emotional harms she claims to have suffered as a result of receiving the Notices from BOA which, if true, may support an award of actual damages for emotional distress. BOA disputes the credibility of the Debtor's Affidavit.

Drawing all reasonable inferences in the Debtor's favor, I am satisfied that the issue of damages cannot be decided absent an appropriate factual determination that cannot be made at the summary judgment stage.[23]

---

[23]    The Debtor has been represented by her husband, Eran Rubenstein, in this adversary proceeding.  Mr. Rubinstein submitted an affidavit in which he asserts that he has spent 173.75 billable hours in this matter resulting in attorney's fees of $34,750.00 and costs of $606.43.

A lurking issue in this proceeding is whether the Debtor will be entitled to attorney's fees if she proves that a willful violation of the automatic stay occurred but fails to establish that she suffered actual damages as a result of the stay violation. Courts are divided on this question. Compare  In re Garnier, 557 B.R. 349 (Bankr. M.D. Pa. 2016) (attorney's fees alone are not considered "actual damages" and should not be awarded for a violation of the automatic stay) (citing cases); In re Micro Marketing Intern, Inc., 150 B.R. 573, 575 (Bankr. M.D. Pa. 1992) (citing In re Whitt, 79 B.R. 611 (Bankr. E.D. Pa. 1987)) (attorney's fees are only allowed "to embellish actual damages"); In re Sturman, 2011 WL 4472412, at *3 (S.D.N.Y. Sept. 27, 2011) (citing cases);  In re Lichtenstein, 2009 WL 874198, at *2 (S.D.N.Y. Mar. 31, 2009) ("Courts are reluctant to award attorney's fees where such fees are . . . the debtor's only damages.") (citation omitted) with In re Voll, 512 B.R. 132 (Bankr. N.D.N.Y. 2014) (debtors entitled to reasonable attorney's fees despite having failed to show emotional distress); In re Burkart Sr. d/b/a Burkart Automotive, 2010 WL 502945, at *6 (Bankr. N.D.N.Y. Feb. 9, 2010) (same and noting that such damage award is only permitted "provided the circumstances do not point out an inclination for excessive litigiousness"); In re Singley, 233 B.R. 170, 174-5 (Bankr. S.D. Ga. 1999).

## VII.  CONCLUSION

BOA has not mustered sufficient evidence to establish definitively that an agency

relationship existed between BOA and NRAC when BOA engaged in debt collection efforts

against the Debtor.  A factual dispute also exists whether the Debtor suffered damages as a

proximate result of the alleged violation of the automatic stay.  Consequently, BOA's motion for

summary judgment will be denied.

An appropriate order follows.

**Date:  February 8, 2019**
_____
**ERIC L. FRANK**
**U.S. BANKRUPTCY JUDGE**