IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| Susan Boltz-Rubinstein, | : | CIVIL ACTION |
| | : | NO. 19-4628 |
| Appellant, | : | |
| | : | |
| v. | : | |
| | : | |
| Bank of America, N.A., | : | |
| | : | |
| Appellee. | : | |

M E M O R A N D U M

EDUARDO C. ROBRENO, J.                    January 13, 2021

I.    **INTRODUCTION**

This is an appeal from a bankruptcy case before Judge Eric
L. Frank in the United States Bankruptcy Court for the Eastern
District of Pennsylvania (the "Bankruptcy Court"). Appellant
Susan Boltz-Rubinstein ("Boltz-Rubinstein") contended that
Appellee Bank of America, N.A. ("BANA") committed a willful
violation of an automatic stay by sending her a pre-foreclosure
notice. The Bankruptcy Court found that BANA did not violate the
stay because it was acting as an agent for another entity,
National Residential Assets Corporation ("NRAC"), which had
obtained relief from the stay before BANA sent the pre-
foreclosure notice to Boltz-Rubinstein. Alternatively, the
Bankruptcy Court found that even if BANA was not NRAC's agent,

Boltz-Rubinstein could not obtain relief because she suffered no
proximately caused damages.

On appeal, Boltz-Rubinstein makes two main arguments: (1)
that the Bankruptcy Court erred in finding an agency
relationship between NRAC and BANA (which includes the analysis
that Boltz-Rubinstein refers to as reverse veil piercing), and
(2) that the Bankruptcy Court erred in finding that she did not
suffer any proximately caused damages. The Court will affirm
Judge Frank's agency finding that BANA was acting as an agent
for NRAC based on the conduct between BANA and NRAC inter se
because this finding was not clearly erroneous. The Court will
decline to rule on the issue of damages as this was an
alternative basis for the decision in this case.

## II. FACTUAL/PROCEDURAL BACKGROUND

On November 15, 2005, Boltz-Rubinstein obtained a $593,334
mortgage loan ("the Loan") from BANA and executed a Note in
favor of BANA (the "Note"). The Loan was secured by a Mortgage
(the "Mortgage") on a piece of real estate located at 3444
Wiltshire Road, Furlong, Pennsylvania (the "Mortgaged
Property"). In early November of 2005, prior to the issuance of
the Loan, the Bank of New York Mellon ("BNYM") and BANA entered
into a Servicing Agreement by which BANA was to service various
loans that BANA transferred to BNYM. The Servicing Agreement
permitted BANA to "effectuate foreclosure or other conversion of

2

the ownership of the Mortgaged Property securing any Mortgage
Loan it services." Appellant's Br. 7, ECF No. 5.

On January 27, 2006, BANA sold the Loan to BNYM. On
February 8, 2010, the Servicing Agreement was amended by letter
(the "Servicing Amendment") to provide that "[i]f title to any
Mortgaged Property is acquired in foreclosure or by deed in lieu
of foreclosure, the deed or certificate of sale shall be taken
in the name of 'National Residential Assets Corp.' unless
Servicer [BANA] is directed otherwise by Owner [BNYM]." Id. at
8. BANA and BNYM signed the Servicing Amendment.

On August 3, 2010, Boltz-Rubinstein filed a Chapter 13
bankruptcy petition. The petition triggered an automatic stay
pursuant to 11 U.S.C. § 362 of all debt collection against
Boltz-Rubinstein. On December 10, 2010, BANA assigned the
Mortgage to NRAC, and the assignment was recorded on January 10,
2011. On March 21, 2011, BANA filed a Proof of Claim[1] in Boltz-
Rubinstein's bankruptcy case. The Proof of Claim identified NRAC
as the creditor and BANA as the servicing agent for NRAC, and
attached the Assignment of Mortgage from BANA to NRAC.

---

[1]     Technically it was BAC North America Holding Company ("BACNAH") that
filed the Proof of Claim, but the facts herein substitute BANA for BACNAH for
the sake of simplicity since BANA is wholly owned by BACNAH. For context,
BACNAH is a direct, wholly owned subsidiary of NB Holdings Corporation, and
NB Holdings is a direct, wholly owned subsidiary of Bank of America
Corporation.

Over the next five years, Boltz-Rubinstein failed to make
more than $115,000 in post-petition payments owed under the
Note. On May 4, 2016, NRAC filed a motion for relief from the
automatic stay in order to begin foreclosure proceedings against
the Mortgaged Property. Boltz-Rubinstein opposed NRAC's motion.

On June 23, 2016, a hearing was held on NRAC's motion for
relief. Boltz-Rubinstein appeared pro se at the hearing.[2] During
the hearing, counsel for NRAC represented that BANA was the loan
servicer for NRAC. The same day, the Bankruptcy Court granted
NRAC's motion for relief from the automatic stay. The Stay
Relief Order, however, did not mention BANA.

Shortly following the lifting of the stay, BANA sent Boltz-
Rubinstein six communications related to the Loan: two letters
informing her that BANA is the servicer of the Loan for which
BNYM is the investor/owner; an Act 91 notice;[3] and three letters
regarding loan assistance options. Boltz-Rubinstein's bankruptcy
case was discharged in September 2016.

In 2019, Boltz-Rubinstein brought an adversary proceeding
in the Bankruptcy Court under 11 U.S.C. § 362(k),[4] contending

---

[2]     Boltz-Rubinstein is represented by counsel in this appeal.
[3]     An Act 91 notice is simply a notice that Pennsylvania law requires
mortgage lenders to send to homeowners facing foreclosure. As Judge Frank
notes, it is sent "as a prelude to foreclosure [and] is clearly an act to
collect a debt." Appellant's Br. App. Volume 1, at 17:20-21, ECF No. 5.
[4]     11 U.S.C. § 362(k)(1) provides that "[e]xcept as provided in paragraph
(2), an individual injured by any willful violation of a stay provided by
this section shall recover actual damages, including costs and attorneys'
fees, and, in appropriate circumstances, may recover punitive damages."

that BANA violated the automatic stay by sending the pre-
foreclosure notice because BANA does not have an agency
relationship with NRAC, the relief from stay beneficiary. Boltz-
Rubinstein was seeking both lost wages and emotional distress
damages.

The Bankruptcy Court found after notice and hearing,
largely based on testimony from Ann Golio, the Vice President of
mortgage accounting at BNYM and President of NRAC, that: 1) NRAC
is a wholly-owned subsidiary of BNYM, Appellant's Br. App.
Volume 1, at 13:11, ECF No. 5; 2) NRAC "was supposed to be a
paper company that would hold title to foreclosed real estate
until it could be sold. It was not supposed to hold mortgages or
receive payments from servicers," id. at 15:2-5; and 3) although
this was the intended role, this is not how NRAC operated in
practice. The Bankruptcy Court explained that

> [i]n actuality, mortgage originators like Bank of
> America made mortgage loans, then sold the loans to
> Bank of New York Mellon. Bank of America retained
> ownership of the mortgage and acted as servicer for
> the mortgage, paying monthly proceeds to Bank of New
> York Mellon, but if the mortgage went into default,
> Bank of America would assign the mortgage to NRAC, in
> some cases, file a foreclosure action, as NRAC's
> agent, and proceed through the execution and sale
> process in foreclosure. The end result of this was
> that NRAC only held mortgages, typically, for a short
> period of time before they were foreclosed upon and
> then quickly obtained title to the real property at a
> sheriff's sale; however, sometimes, the process did
> not move along smoothly and quickly and a mortgage
> ended up being held by NRAC for a substantial period
> of time. This case is an example of that.

Id. at 15:10-18.

The Bankruptcy Court found that BANA acted as an agent of NRAC through the above-described conduct. Accordingly, Judge Frank found that BANA, as agent, did not commit a willful violation of the automatic stay by sending a pre-foreclosure notice since NRAC, the principal, had obtained relief from the automatic stay. Judge Frank also found that agency had been established through the alternative theories of estoppel and domination. Finally, also in the alternative, he found that even if BANA was not NRAC's agent, Boltz-Rubinstein could not obtain relief because she suffered no proximately caused damages.

On appeal, Boltz-Rubinstein argues the Bankruptcy Court erred in (1) finding an agency relationship between BANA and NRAC and (2) finding that she did not suffer any proximately caused damages.

**III. LEGAL STANDARD**

In reviewing an appeal from a bankruptcy court decision, this Court "applies a clearly erroneous standard to findings of fact, conducts plenary review of conclusions of law, and must break down mixed question[s] of law and fact, applying the appropriate standard to each component." In re Li, 249 B.R. 388, 389-90 (E.D. Pa. 2000) (quoting Meridian Bank v. Alten, 958 F.2d 1226, 1229 (3d Cir. 1992)). Under the clearly erroneous standard

of review, the bankruptcy court's findings of fact will not be
disturbed unless "the reviewing court on the entire evidence is
left with the definite and firm conviction that a mistake has
been committed." See United States v. U.S. Gypsum Co., 333 U.S.
364, 395 (1948); see also In re DeVal Corp., 601 B.R. 725, 734
(E.D. Pa. 2019) (court can overturn findings of fact only if
they "(1) [are] completely devoid of minimum evidentiary support
displaying some hue of credibility or (2) bear[] no rational
relationship to the supportive evidentiary data." (quoting In re
Diloreto, 442 B.R. 373, 375 (E.D. Pa. 2010))).

For final, mixed questions of law and fact, the standard of
review depends on "whether answering [the question] entails
primarily legal or factual work." U.S. Bank Nat'l Ass'n ex rel.
CWCapital Asset Mgmt. LLC v. Vill. at Lakeridge, LLC, 138 S. Ct.
960, 967 (2018). Appellate courts apply "deference" to the trial
court when deciding mixed questions that "immerse courts in
case-specific factual issues – compelling them to marshal and
weigh evidence" and "make credibility judgments." Id. (citing
Pierce v. Underwood, 487 U.S. 552, 561-62 (1988)). When the
trial court "takes a raft of case-specific historical facts,
considers them as a whole," and "balances them one against
another," the court's determination is subject to the clear
error standard. See id. at 968. Such an "inquiry . . .
(primarily) belongs[] in the court that has presided over the

presentation of evidence, that has heard all the witnesses, and
that has both the closest and the deepest understanding of the
record – i.e., the bankruptcy court." Id.

Here, only the standard for the final, mixed questions of
law and fact in this case is contested. Boltz-Rubinstein
contends a de novo standard should be used, while BANA contends
a clear error standard should be used.

The Bankruptcy Court's agency finding (which included the
analysis that Boltz-Rubinstein refers to as reverse veil
piercing) was based largely on the testimony of Ms. Golio, a key
witness whose testimony the Bankruptcy Court found to be
credible. See Appellant's Br. App. Volume 1, at 22:16-20, ECF
No. 5 ("Golio's description of the NRAC business model, actual
operations, and interactions with Bank of America has persuaded
me that NRAC entered into a servicer-agency relationship with
Bank of America by their conduct."); see also E.I. DuPont de
Nemours & Co. v. Rhone Poulenc Fiber & Resin Intermediates,
S.A.S., 269 F.3d 187, 198-99 (3d Cir. 2001) (recognizing that
the existence of an agency relationship is a "fact-intensive
inquiry" to be decided by the trial court). Consequently, the
final mixed question of law and fact at issue in this case
concerning agency was primarily a factual inquiry and will be
reviewed under a clear error standard. The Court need not
determine the appropriate legal standard for the remaining mixed

questions of law and fact because they were alternative rulings
and the Court declines to rule on them for the reasons explained
below.

## IV.  DISCUSSION

### A. The Agency Relationship Between NRAC and BANA

The Bankruptcy Court held that an agency relationship
existed between NRAC and BANA on three separate grounds:
conduct, estoppel, and domination.

As to conduct, there are three elements under Pennsylvania
law[5] that courts look to in determining whether an agency
relationship exists: (1) "the manifestation by the principal
that the agent shall act for him," (2) "the agent's acceptance
of the undertaking," and (3) "the understanding of the parties
that the principal is to be in control of the undertaking."
<u>Basile v. H&R Block, Inc.</u>, 761 A.2d 1115, 1120 (Pa. 2000)
(quoting <u>Scott v. Purcell</u>, 415 A.2d 56, 50 (1980)).

---

[5]      Ordinary state law principles of agency apply "unless, in the
appropriate case, the rules of agency are superceded or modified by the
Bankruptcy Code or an order of the Bankruptcy Court." <u>See</u> <u>In re Mushroom
Transp. Co.</u>, 282 B.R. 805, 821-22 (E.D. Pa. 2002) (Robreno, J.) (citing
<u>Strang v. Bradner</u>, 114 U.S. 555, 560 (1885)), <u>aff'd in part</u>, <u>rev'd in part on
other grounds</u>, 382 F.3d 325 (3d Cir. 2004). "Nothing in the Bankruptcy Code
nor the Bankruptcy Rules overrides the law of agency" and the well settled
elements needed for an agency relationship to exist. <u>See</u> <u>id.</u> at 822 n.15. In
this case, Pennsylvania agency law seems to apply. As Judge Frank explained,
Boltz-Rubinstein and BANA "have not stated which jurisdiction's law should
apply here. They generally cite Pennsylvania law, so I follow their lead.
Since the legal principles of agency from the common law are similar to the
law of virtually any relevant state, this decision does not have much impact
on the case." Appellant's Br. App. Volume 1, at 22:23-23:3, ECF No. 5.

However, it is well settled that "[i]t is not necessary
that the parties explicitly state their intention to create an
agency relationship." Goodway Mktg., Inc. v. Faulkner Advert.
Assocs., Inc., 545 F. Supp. 263, 267 (E.D. Pa. 1982) (citing
Brock v. Real Estate-Land Title & Tr. Co., 178 A. 146 (1935)).
"In establishing agency, one need not furnish direct proof of
specific authority, provided it can be inferred from the facts
that at least an implied intention to create the relationship of
principal and agent existed. Moreover, existence of the
relationship may be found in acquiescence or failure to
disavow." Commonwealth v. Makler, 716 A.2d 619, 623 (Pa. Super
Ct. 1998); see also Yezbak v. Croce, 88 A.2d 80, 82 (Pa. 1952)
("[T]he existence of an agency does not need to be established
by evidence of specific authority but may be implied from all
the attending circumstances."); 51 I&N, Inc. v. Rosen, 24 Phila.
Co. Rptr. 98, 103-04 (Ct. Com. Pl. 1992) (agency relationship
existed where principal was "well aware" that the individual was
the "de facto agent" and "[principal's] acquiescence can
certainly be inferred from this knowledge and continued failure
to object").

Boltz-Rubinstein argues that none of the three agency
elements have been met in this case and that BNYM's ownership of
the Loan undermines the agency relationship between BANA and
NRAC. These arguments will be addressed in turn.

1. <u>Manifestation by NRAC that BANA shall act for it</u>

Boltz-Rubinstein argues that there was no manifestation by NRAC that BANA shall act for it because (1) BANA was not mentioned in NRAC's motion to lift the stay, (2) NRAC doesn't do anything; and (3) the Servicing Agreement/Amendment, neither of which NRAC signed, make clear that BANA and BNYM were in an agency relationship, rather than BANA and NRAC.

Boltz-Rubinstein's arguments are unpersuasive. First, although BANA was not mentioned in NRAC's written motion to obtain relief from the stay, at the hearing on NRAC's motion to lift the stay, counsel for NRAC pointed out that BANA was the servicer for NRAC. Second, Boltz-Rubinstein does not cite any authority to support the contention that NRAC cannot assent to an agency relationship merely because it is a holding company that is not actively engaged in servicing and foreclosure. Third, whether or not BANA and BNYM were in an agency relationship and whether or not NRAC signed the Servicing Agreement/Amendment is not relevant to whether NRAC and BANA were in an agency relationship. Boltz-Rubinstein cites no authority to show that an agent cannot have more than one principal or that a written agreement signed by the principal is necessary to create an agency relationship.

Here, Judge Frank found (through the credible testimony of Ms. Golio, the President of NRAC) that although NRAC's role was

intended to be limited to holding title to foreclosed real
estate until it could be sold, this is not what occurred in
practice. In practice, BANA would assign defaulted mortgages to
NRAC, and if NRAC held the mortgage for a substantial period of
time, NRAC expected BANA to file a foreclosure action as NRAC's
agent and proceed through the execution and sale process in
foreclosure. This case is an example of that.[6] Judge Frank also
found the following:

> Ann Golio also credibly testified that roughly the
> same process occurred for other mortgages held by
> NRAC. If Bank of America was still servicing them for
> Bank of New York Mellon at the time they were assigned
> to NRAC, Bank of America would continue servicing the
> mortgages for NRAC. While Golio's testimony did not
> state how many mortgages were assigned to NRAC and
> continuously serviced by Bank of America, it was clear
> from her testimony that this had occurred a number of
> times with some defaults eventually leading to
> foreclosure performed by Bank of America in NRAC's
> name.[7]

Appellant's Br. App. Volume 1, at 25:20-26:5, ECF No. 5.

NRAC's representation by counsel at the hearing on the
motion to lift the stay that BANA was going to be its servicer,

---

[6]     Judge Frank found that NRAC recorded the assigned mortgage from BANA on
January 10, 2011. Foreclosure has still not occurred, and BANA has been
servicing the mortgage for NRAC for a decade now.
[7]     Boltz-Rubinstein's Reply Brief asserts that the claim that BANA has
obtained foreclosure title for NRAC several times in the past is
unsubstantiated because there has been no documented evidence presented of
this. But Boltz-Rubinstein offers no authority for the proposition that Judge
Frank could not make this finding of fact based on credible testimony alone.
Boltz-Rubinstein also argues that BANA's assertion that it sought to obtain
foreclosure in the name of NRAC contradicts the existence of an agency
relationship between the two parties. The Court does not find such an act to
be contradictory of an agency relationship.

coupled with Ms. Golio's testimony about NRAC's expectations and
the course of dealing between the parties, demonstrates a
manifestation by NRAC that BANA would act for it.

> ## 2. BANA's acceptance of the undertaking

Boltz-Rubinstein argues that "BANA completely failed to
marshal any BANA employee witness to support the acceptance of
the undertaking" and again reiterates that BANA was not
mentioned in NRAC's motion to lift the stay or the resulting
Stay Relief Order. Appellant's Br. 29, ECF No. 5. However,
Boltz-Rubinstein cites no authority for the proposition that
BANA was required to produce a BANA employee at trial in order
to show its acceptance of the undertaking.

Here, BANA's acceptance of the undertaking is demonstrated
by Ms. Golio's testimony outlined above concerning the course of
dealing between BANA and NRAC. See supra Section IV.A.1. BANA's
acceptance may be implied through Ms. Golio's testimony
concerning BANA's actions over the years, such as the multiple
cases in which BANA took steps to obtain foreclosure title for
NRAC, including by proceeding with foreclosure actions in NRAC's
name and taking other steps on NRAC's behalf. BANA's
understanding that it was NRAC's agent is further confirmed in
this case by the filing of a Proof of Claim by BANA, see supra
note 1 and accompanying text, identifying BANA as NRAC's

servicing agent.[8] This activity, coupled with the course of
dealing described above, is sufficient to show that BANA
believed it was an agent for NRAC. See Scott v. Purcell, 399
A.2d 1088, 1093 (Pa. Super. Ct. 1979) (agency relationship
existed where agent's "activities . . . strongly suggest that he
was acting as [principal's] agent").

     3. Understanding of the parties concerning control

     Boltz-Rubinstein argues that an understanding of the
parties that NRAC was to be in control of the undertaking was
not demonstrated because Ms. Golio testified as follows: (1)
BANA does not have a servicing agreement with NRAC; (2) NRAC did
not directly give authority to BANA to proceed through
foreclosure on its behalf; and (3) BANA does not communicate
with NRAC before taking action involving servicing or
foreclosure.

     These arguments are also unpersuasive. Boltz-Rubinstein
cites no authority for the proposition that a principal must
provide an express agreement or direct communications or even
provide direct authority. As explained above, an

---

[8]    Boltz-Rubinstein's Reply Brief argues that BANA could not have
confirmed an understanding that it was NRAC's agent through its own filing
which included no evident participation by NRAC. But the entire point of the
second prong is to demonstrate the agent's understanding, not the principal's
understanding, so there is no need for NRAC to have participated in order to
show an understanding on the part of BANA.

Case 16-00265-elf   Doc 20   Filed 01/18/120   Entered 01/27/21 14:03:35   Desc Main
Document      Page 15 of 17

implicit/indirect agency relationship may be inferred through
the parties' activities and course of dealing.

Here, regardless of whether NRAC and BANA ever expressly
communicated to each other the nature of their relationship, or
whether NRAC ever explicitly gave authority to BANA to foreclose
on its behalf, Ms. Golio's testimony above, see supra Section
IV.A.1, demonstrates an implied understanding between the
parties that when BANA assigned mortgages to NRAC, NRAC was
authorized to direct BANA's actions. Under these circumstances,
BANA would then, in certain cases, commence with foreclosure
proceedings on behalf of NRAC. There is no evidence that NRAC
ever objected to or otherwise disagreed with BANA's conduct
throughout the course of their dealings. In sum, an
understanding between the parties that NRAC was to be in control
of the undertaking may be implied by BANA's assignment of
mortgages to NRAC and BANA's subsequent course of conduct in
acting on NRAC's behalf.

### 4. BNYM's ownership of the Loan

Boltz-Rubinstein argues that no agency relationship exists
because BANA sold the Loan to BNYM and, hence, "there was
nothing for BANA as originator to transfer from itself to NRAC
when BANA purported to do so via the post-petition assignment in
2010." Appellant's Br. 38–39, ECF No. 5. But the Loan and the
Mortgage are not the same thing. The Loan is the sum of money

"lent for the borrower's temporary use," which is evidenced by
the Note, while the Mortgage is the instrument that secures the
Loan. See Loan, Note, Mortgage, Black's Law Dictionary (11th ed.
2019). Judge Frank found (based on Ms. Golio's credible
testimony) that the Loan was sold to BNYM, but BANA retained
ownership of the Mortgage until it was assigned to NRAC. Id.
App. Volume 1, at 15:10-18.[9] Boltz-Rubinstein offers no authority
to support the proposition that the owner of the loan and the
owner of the mortgage cannot be two separate entities.

For all of the foregoing reasons, Judge Frank's finding
that BANA and NRAC's conduct evidenced an agency relationship is
not clearly erroneous. As a result, the Court declines to
address Boltz-Rubinstein's reverse piercing argument since that
analysis is contained within the estoppel/domination theories
that Judge Frank ruled on in the alternative. The Court also
declines to address Boltz-Rubinstein's arguments related to

---

[9]    Although the Servicing Agreement states that the ownership of the
Mortgage would vest in BNYM, the totality of Ms. Golio's testimony and the
course of dealing between the parties indicates that the parties intended
BNYM to be the beneficial owner of the Mortgage, while BANA would remain the
legal owner of the Mortgage. Boltz-Rubinstein seems to suggest that the
consequence of this (i.e., allowing BANA to retain record title after selling
the Mortgage to BNYM) was to depict continued ownership by BANA and conceal
BNYM's ownership in violation of public policy. Boltz-Rubinstein cites no
authority for the proposition that such a relationship is against public
policy. Although the Servicing Agreement further indicates that BANA's
retention of the Mortgage was intended to be in a custodial capacity only,
there is no reason why this would impact BANA's legal authority to assign the
Mortgage to NRAC, particularly given that the Servicing Amendment explicitly
directs BANA to take the deed or certificate of sale in the name of NRAC.

damages, as Judge Frank also ruled on those only in the

alternative.

**V. Conclusion**

    For all of the aforementioned reasons, we will affirm the

decision of the Bankruptcy Court. An appropriate order follows.